Jacob ADAMS et al.

v.

Cyrus VANCE, Secretary of State, et al., Appellants.

No. 77–1960.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 24, 1977.

Order Oct. 24, 1977.

Opinion Jan. 17, 1978.

Bruce C. Rashkow, Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen., Edmund B. Clark and Margaret Strand, Attys., Dept. of Justice, Washington, D. C., were on the motion for summary reversal, for appellants.

S. Lynn Sutcliffe, Washington, D. C., pro hac vice, by special leave of Court, for appellees.

Roger A. Klein, Washington, D. C., was on the memorandum of amicus curiae, Center for Environmental Education, Inc.

Oliver A. Houck, Washington, D. C., was on the brief for amicus curiae, National Wildlife Federation.

Bernard Fensterwald, Jr. and Marc Feldman, Washington, D. C., were on the memorandum of amicus curiae, Committee for Humane Legislation, Inc., in support of appellants' motion for summary reversal.

Before LEVENTHAL, ROBINSON and WILKEY, Circuit Judges.

## ORDER

PER CURIAM.

This cause came on for consideration of appellants' motion for summary reversal and appellees' motion to dismiss and the Court heard argument of counsel.

The Court is of the view that it has jurisdiction of the appeal from the order requiring the Secretary of State to file an objection. The Court is further of the view that this order should be vacated. The District Court assumed that there would be no injury to the United States if an objection were filed by the United States with the International Whaling Commission because such an objection could be withdrawn. However, the possibility of injury to the United States even from a provisional objection is set forth in the affidavits filed in this Court and similar assertions in the Environmental Impact Statement, in terms of prejudicing the ongoing efforts of the United States government to establish and administer an effective international machinery for the protection of marine mammals.

On consideration of the foregoing, it is

ORDERED by the Court that the order of the District Court be, and the same hereby is, vacated. Our order is issued without accompanying opinion in consideration of the time emergency.

Opinion for the Court filed by LEVEN-THAL, Circuit Judge.

This case concerns a challenge by the Inupiat Eskimos to a decision by the Secretary of State. The International Whaling Commission (IWC) banned Eskimo hunting of the bowhead whale, subject to objection by the United States. On October 20, 1977, four days before the deadline for an objection, the Secretary decided against one. Plaintiffs sued the Secretary, and the District Court ordered him to object. That order was based on the unwarranted assumption that such objection would not harm the United States because the objection could be withdrawn. That assumption is clearly erroneous insofar as it represents a projection of fact, and is an unwarranted intrusion on executive discretion in the field of foreign policy and agreements insofar as it represents a judgment. We promptly vacated the order, and in this opinion we state our reasons. Subsequent to our order, on December 6 and 7, 1977, the IWC changed its position to permit subsistence hunting by Alaskan natives of a limited number of bowhead whales, but our opinion is to be read prospectively, as if issued on the date of the order.

## I. BACKGROUND

The present controversy is the result of long-standing international concern over the survival of the bowhead whale, *Balaena mysticetus*. Subsistence hunting of the bowhead has been the vital element of a millenia-old Eskimo culture. Such hunting posed no danger to the bowhead during the time when its population was at a natural high level. However, irresponsible commercial whaling in the late nineteenth and early twentieth century drastically reduced the bowhead population. Although the bowhead had been under international protec-

tion from commercial whaling for most of the twentieth century, it has failed to proliferate back to its former level. If the bowhead population levels remain low, the species will be vulnerable to extinction by overhunting, oil pollution, or the spontaneous population "crashes" which occur in small populations. Accordingly, with the cooperation of the Eskimos themselves, the United States began steps toward regulation of Eskimo whaling which could protect the bowhead without impairing the unique Eskimo culture.[1]

Before the United States could complete its domestic efforts at whaling control, the International Whaling Commission (IWC), a regulatory body presently consisting of members from seventeen nations, notified the United States in July, 1977 that it was eliminating the subsistence hunting exemption which had allowed Eskimos to hunt bowheads. The consequences of the IWC action are defined by treaty and statute.[2] Essentially, if the Secretary of State on behalf of the United States objected to the IWC action within 90 days (i. e. by 12:00 G.M.T., October 24, 1977) that IWC action would not become effective against the United States. In the absence of such objection, the IWC action would subject Eskimos who continue to hunt bowheads to criminal prosecution.

The United States prepared an elaborate draft environmental impact statement as a basis for the decision on whether to object, and revised the statement after extensive comment by legal representatives of the Eskimos, Alaskans, environmentalists, scientists, U.S. officials and others. On October 20, the Secretary of State announced that the United States would not object. Instead, he declared he would seek reconsideration of the IWC action at an IWC meeting in December. This course of action was approved by the President.

---

1. The Secretary of Commerce has power to regulate Eskimo whaling under the Marine Mammal Protection Act of 1972, 16 U.S.C. § 1371(b). Preparation for promulgation of regulations was proposed last June, 42 Fed. Reg. 29946 (June 10, 1977).

   At present, many whales are struck and wounded or killed without being landed. Regu-

   lation of the techniques of whaling which reduced the struck and lost rate might allow the Eskimos to continue to hunt without severe impact on the whale population.

2. International Whaling Convention of December 2, 1946, 62 Stat. 1716, T.I.A.S. 1849; Whaling Convention Act of 1949, 16 U.S.C. § 916 *et seq.*

On October 21, the plaintiffs sued the Secretary of State on behalf of the Eskimos who would lose their freedom to hunt as a result of the failure to object. Plaintiffs noted the long history of statutes and administrative and judicial decisions which clearly recognize Eskimo land, fishing and whaling rights, and claimed the Secretary's decision violated the trust obligation to the Eskimos implicit in those statutes and decisions.[3] They also asserted that the environmental impact statement had failed to analyze important alternatives open to the Secretary. Noting that the deadline for objections was only three days away, plaintiffs asked the District Court to enter forthwith a temporary restraining order that would require the Secretary to file an objection. Such an objection, they contended, would not substantially harm the United States' efforts at international environmental cooperation because the International Whaling Convention of 1946 allows objections to be withdrawn freely any time after they are made.

After a short hearing on the afternoon of October 21, the District Court granted the relief requested, and directed the Secretary to file the objection. The court's order was explicitly premised on its view that "defendants will suffer no substantial harm through the issuance of a temporary restraining order, whereas plaintiffs will suffer the loss of their opportunity to mean-ingfully present their claims should their application be denied." The Secretary immediately appealed. We heard oral argument on October 24, a Federal holiday, and entered an order of reversal by 1:00 p. m., E.S.T.

## II. JURISDICTION

At the outset, plaintiffs challenge our jurisdiction of this appeal. The District Court's order to the Secretary was styled as a temporary restraining order, and its directions concerned an action within the next ten days. The grant of a temporary restraining order under Rule 65(b), Fed.R. Civ.P., is generally not appealable. However, "[t]he label attached to an order by the trial court is not decisive with regard to whether it falls under Rule 65(a) or Rule 65(b) and the appellate court will look to other factors to determine whether an appeal should be allowed." Wright & Miller, Federal Practice and Procedure § 2962, at 619 (1973). Here the order was in purpose and effect a mandatory injunction appealable under 28 U.S.C. § 1292(a)(1). It did not merely preserve the status quo pending further proceedings, but commanded an unprecedented action irreversibly altering the delicate diplomatic balance in the environmental arena. When an order directs action so potent with consequences so irretrievable, we provide an immediate appeal to protect the rights of the parties.[4]

---

**3.** Early legislation concerning Alaska respected the Eskimos' land rights. Act of May 17, 1884, ch. 53, § 8, 23 Stat. 26; Act of June 6, 1900, ch. 786, § 27, 31 Stat. 330. *See* 25 U.S.C. § 280a. These statutes and others have been interpreted in light of Congress's clear understanding that the Eskimos' livelihood depended on their catch from the sea. *See, e. g., Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918); *Hechman v. Sutter,* 119 Fed. 83, 88 (9th Cir. 1902); *Aboriginal Fishing Rights in Alaska,* 57 I.D. 461 (1942); *Tlingit and Haida Indians of Alaska v. United States,* 182 Ct.Cl. 130, 389 F.2d 778, 791–92 (1968) (Nichols, J., dissenting) (contending that Eskimo fishing rights are compensable when taken).

The Alaska Native Claims Settlement Act of 1971, 43 U.S.C. § 1603, extinguished aboriginal fishing rights, but the Congressional intent was apparently to quiet title to land rather than to end the still-intact obligation of the United States as trustee to protect the subsistence of the Eskimos. S.Rep.No. 92–581, 92nd Cong., 1st Sess. 37 (1970), *reprinted in* 1971 U.S.Code Cong. and Admin.News pp. 2247, 2250; *Aleut Community of St. Paul Island v. United States,* 202 Ct.Cl. 182, 480 F.2d 831 (1973); *United States v. Atlantic Richfield Co.,* 435 F.Supp. 1009, 1030 n.66 (D.Alaska 1977); *Edwardsen v. Morton,* 369 F.Supp. 1359 (D.D.C.1973). Congressional concern for the Eskimos' subsistence whaling needs has been manifested in two acts passed after the Alaska Native Claims Settlement Act. Endangered Species Act of 1973, 16 U.S.C. § 1539(e); Marine Mammal Protection Act of 1972, 16 U.S.C. § 1371(b).

**4.** *See Berrigan v. Sigler,* 154 U.S.App.D.C. 334, 475 F.2d 918 (1973). The instant order presents a stronger case for appealability than *Belknap v. Leary,* 427 F.2d 496 (2d Cir. 1970), where the short-term order found by the court

Defendants argue that the basic issue in this case is a nonjusticiable political question. The Secretary's decision not to object to the IWC action is within the foreign affairs "prerogative," they contend, and a challenge to the conduct of this country's foreign affairs by the President and the State Department is not capable of judicial resolution.[5] Plaintiffs respond that the Secretary's manner of decision violated specific Congressional commands, including the laws creating the trust obligation to the Eskimos and the National Environmental Policy Act, and such violations constitute a justiciable controversy.[6]

■ The determination of whether a particular request for relief in a particular case involving foreign affairs presents a political question requires a "discriminating analysis," *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 707, 7 L.Ed.2d 663, 682 (1962). Such a discriminating analysis is difficult on this appeal in view of the abbreviated record and compressed briefing necessitated by the upcoming deadline. We need not determine the application of the political question doctrine on this appeal from an early order in the case. Even if we assume,

without deciding, that this request for relief is justiciable, the order of the District Court must be vacated.[7]

## III. DENIAL OF INTERIM INJUNCTION

■ The District Court treated this application for immediate injunctive relief as an ordinary one. Yet when requested immediate injunctive relief deeply intrudes into the core concerns of the executive branch, a court is "quite wrong in routinely applying to this case the traditional standards governing more orthodox 'stays'." *Sampson v. Murray*, 415 U.S. 61, 83–84, 94 S.Ct. 937, 950, 39 L.Ed.2d 166, 183 (1974). A request for an order directing action by the Secretary of State in foreign affairs plainly constitutes such intrusion. Courts must beware "ignoring the delicacies of diplomatic negotiation, the inevitable bargaining for the best solution of an international conflict, and the scope which in foreign affairs must be allowed to the President," *Mitchell v. Laird*, 159 U.S.App.D.C. 344, 349, 488 F.2d 611, 616 (1973).[8] Courts must take into account that international negotiations

to be an appealable "mandatory injunction" did not threaten the government defendant with irretrievable harm.

**5.** Defendants cite *Oetjen v. Central Leather Co.*, 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918); *The Chinese Exclusion Case*, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889); *Jensen v. National Marine Fisheries Service*, 512 F.2d 1189 (9th Cir. 1975).

**6.** "It was intimated [in *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936)] that the President might act in external affairs without congressional authority, but not that he might act contrary to an Act of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 636 n.2, 72 S.Ct. 863, 870–71 n.2, 96 L.Ed. 1153, 1199–1200 n.2 (1952) (Jackson, J., concurring).

**7.** Since an allegation of nonjusticiability calls into question our jurisdiction under Article III, we would normally resolve it before reaching the merits. However, when the merits of a case are clearly against the party seeking to invoke the court's jurisdiction, the jurisdictional question is especially difficult and far-reaching, and the inadequacies in the record or briefing make the case a poor vehicle for deciding

the jurisdictional question, we may rule on the merits without reaching the inappropriately presented jurisdictional contention. *Philbrook v. Glodgett*, 421 U.S. 707, 721, 95 S.Ct. 1893, 1902, 44 L.Ed.2d 525, 537 (1975); *Secretary of the Navy v. Avrech*, 418 U.S. 676, 677, 94 S.Ct. 3039, 3040, 41 L.Ed.2d 1033, 1036 (1974); *Chandler v. Judicial Council*, 398 U.S. 74, 86, 90 S.Ct. 1648, 1654–55, 26 L.Ed.2d 100, 109 (1970); *United States v. Augenblick*, 393 U.S. 348, 351–52, 89 S.Ct. 528, 531, 21 L.Ed.2d 537, 542–43 (1969); *Chinese American Civic Council v. Attorney General*, 185 U.S.App.D.C. 1, 566 F.2d 321 (1977). *See Colegrove v. Green*, 328 U.S. 549, 565, 66 S.Ct. 1198, 1208, 90 L.Ed. 1432, 1442 (1946) (Rutledge, J., concurring) (justiciability may be assumed when the issue of justiciability would be momentous and equitable factors clearly disfavor the plaintiff).

**8.** It is on a different aspect of *Mitchell*, the issue of the standing of a Congressman to claim judicially cognizable injury from executive action, that part of the opinion of *Mitchell* was disapproved, in *Harrington v. Bush*, 180 U.S.App.D.C. 45, 553 F.2d 190 (1977), as lacking current vitality in the context of subsequent Supreme Court opinions.

have their own distinctive time frames, and must be careful "to avoid a fixing of our government's course" by premature interposition. *Nielsen v. Secretary of Treasury*, 137 U.S.App.D.C. 345, 356, 424 F.2d 833, 844 (1970).[9]

■ This country's interests in regard to foreign affairs and international agreements may depend on the symbolic significance to other countries of various stances and on what is practical with regard to diplomatic interaction and negotiation. Courts are not in a position to exercise a judgment that is fully sensitive to these matters. Accordingly, while we do not determine the justiciability of a request for relief of this kind, we think it clear that if such a request is justiciable, the party seeking this kind of relief would have to make an extraordinarily strong showing to succeed. Plaintiffs here have not made such a showing.

■ In reviewing the District Court's grant of the injunction, we apply the familiar test of *Virginia Petroleum Jobbers Association v. FPC*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958), as modified by *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 182 U.S.App.D.C. 220, 559 F.2d 841 (1977).[10] As to the first prong of that test, the movant's likelihood of success on the merits, there is little dispute that plaintiffs have presented serious questions of law indicating a substantial case on the merits.[11] It is well established that the United States owes trust obligations to native Americans, including Eskimos, which require administrators to give the Eskimos' interests considerable weight in many decisions. The precise application of that principle to this suit presents a serious question.[12] The Eskimo claim that the environmental impact statement failed to consider possible alternatives to the proposed action may also raise a serious issue.

Accordingly, under the *Holiday Tours* test, we may assume that if the case did not touch on any extraordinary considerations, and if the balance of equitable factors fa-

---

**9.** *See* also *Nielsen,* 137 U.S.App.D.C. at 354, 357, 424 F.2d at 842, 845:

> "An important, if not the dominant, star for guiding national actions and reactions is the desire to build future areas of settlement and good will between nations to replace present areas of tension. * * * While international affairs may move at a pace of bewildering rapidity, often negotiation is conducted with persistence and patience at snail's pace. Negotiation may be deferred while relationships are left to simmer without stirring, in order to strengthen any possible threads of international accord or reconciliation."

**10.** This test requires the court to consider four factors:

> (1) Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal? Without such a substantial indication of probable success, there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review.
> (2) Has the petitioner shown that without such relief, it will be irreparably injured? . . . (3) Would the issuance of a stay substantially harm other parties interested in the proceedings? . . . (4) Where lies the public interest? . . .

*Holiday Tours,* 182 U.S.App.D.C. at 222, 559 F.2d at 843.

Since the District Court believed the order it was requested to issue would have only the limited effect of a temporary restraining order, it did not take into account the full range of factors and balancing required by the *Holiday Tours* test. Under some circumstances, having found that the District Court had applied the wrong test, we would remand for reconsideration in light of the correct test. However, the time emergency here makes such a remand impractical. Accordingly, we have independently assessed the substantiality of plaintiffs' case on the merits, and have reviewed the District Court's assessment of substantial harm and irreparable injury and its balancing of factors. The nature of the substantial harm and irreparable injury here makes detailed discussion of the public interest unnecessary.

**11.** Defendants concede as much. Brief for Appellant at 5. Indeed, officials of the Department of Interior declared in September they believed the United States' trust obligations required an objection.

**12.** *See Joint Tribal Council of Passamaquoddy Tribe v. Morton,* 528 F.2d 370 (1st Cir. 1975); *Coomes v. Adkinson,* 414 F.Supp. 975, 996 (D.S.D.1976); *Pyramid Lake Paiute Tribe of Indians v. Morton,* 354 F.Supp. 252 (D.D.C. 1972); Chambers, *Judicial Enforcement of the Federal Trust Responsibility to Indians,* 27 Stan.L.Rev. 1213, 1234–38 (1975).

vored an injunction which would merely preserve the status quo, injunctive relief would be proper. However, as previously noted, there are special considerations here that require plaintiffs to make an exceptionally strong showing on the relevant factors. Moreover, the order here would not merely be preservative of the status quo.

The District Court misconceived entry of a formal objection to the IWC action here as one which could easily be reversed. The United States has been active in persuading other countries to abide by the restrictions of the whaling agreement, notwithstanding severe impact on their domestic concerns. No other nation has entered an objection to an IWC action since 1973, and the symbolic impact of the United States being the first nation to break that pattern was assessed by cognizant U.S. officials and others as

likely to be quite grave. The environmental impact statement filed in District Court identified the likely effect of such an objection. The United States sharpened the importance of the matter by filing in this court an affidavit by the Honorable Patsy Mink, Assistant Secretary of State for Oceans and International Environmental and Scientific Affairs. We reproduce in the margin the relevant portion.[13] Her conclusions, based on an analysis which was elucidated in detail for the court and which drew on a long record of U.S. efforts to implement the Congressional policy of the Pelly Amendment to the Fisherman's Protective Act of 1967, 22 U.S.C. § 1978, must be accorded great deference. We may presume that an objection to an IWC action which was promptly withdrawn by the United States would have less impact than one which was allowed to stay in effect.

**13.** Since the defendants apparently knew well in advance that the instant suit would be filed and prepared briefs to meet it, we have trouble understanding why this affidavit was not prepared in time to be submitted to the District Court, which specifically asked for such. However, in light of the analysis similar to this affidavit in the environmental impact statement filed in District Court, plaintiffs cannot be said to be surprised by these affidavits, and in view of the interests of justice in a time emergency which makes a remand impractical, we have considered these affidavits on appeal. *See United States v. Kearney*, 136 U.S.App. D.C. 328, 331 n.4, 420 F.2d 170, 173 n.4 (1969); *Chrysler Corp. v. Dunlop*, 490 F.2d 985 (Em. App.1973).

Paragraphs seven and eight of the affidavit declare:

7. It is also my judgment that objection by the United States to the action of the International Whaling Commission would cause substantial injury to United States efforts to achieve and maintain an effective program for the conservation of whales, notwithstanding the subsequent withdrawal of such objection. For many years the United States has urged other countries to make substantial sacrifices in the interest of conservation of whales. More particularly, the United States has consistently urged other governments to accept without modification the recommendations of the Commission's Scientific Committee even where adoption of such recommendations was opposed by politically influential constituencies in their countries. At the present time, the United States Government is the moving force behind the proposed renegotiation of the International Whaling Convention aimed at strength-

ening the international regime for the conservation of whales. Largely as a result of United States leadership—and pressure—no country has objected to a quota established by the International Whaling Commission since 1973, even though several countries, particularly the Soviet Union and Japan, have experienced serious hardship, including socio-economic dislocation. A United States objection at this time would seriously weaken the effectiveness of the International Whaling Commission as an instrument of conservation.

8. If the United States now refuses to do what it has asked of others and objects to a restraint recommended by the Scientific Committee of the International Whaling Commission despite an early opportunity for review, this government's credibility and leadership in international whale conservation would be severely compromised. Foreign governments would regard this U.S. objection to the very first amendment which affects a U.S. domestic interest as evidence of U.S. hypocrisy on whale conservation. Other governments would be less likely to credit U.S. determination to act forcefully on future issues of whale conservation. The weakening of U.S. leadership in this field would make it much more difficult for the United States to achieve its long term objectives for international cooperation in respect to conservation of whales. It is possible that an objection by the United States at this time could lead to a cycle of objections by others which would damage the effectiveness of the established quota system. If this should ensue, a number of whale species would soon face extinction.

Yet it was clear error for the District Court to find that an objection, provisional or otherwise, would not substantially endanger the interests of the United States.

Furthermore, while the ban on whaling may indeed cause irreparable injury to the Eskimos, that injury is by no means certain. Since the fall whaling season is almost over, the IWC's elimination of the exemption allowing Eskimo whaling will have little or no effect until next spring. At an IWC meeting in December 1977, well before the spring whaling season, the U.S. will ask the IWC to reconsider its action, considering the shared concern of all nations for unique native cultures and the United States' steps toward domestic regulation of whaling. If efforts in December come to naught, the Eskimos will be injured by the loss of whaling for one year, but their contingent reserves and assistance from the United States as trustee can mitigate the injury for that year.[14] It would remain open to the United States to object to the quota for bowhead whaling next June, thereby limiting the injury to the Eskimos to a single year. In these ways, the Secretary's refusal to object leaves open avenues for mitigation or complete relief.

We vacate the District Court's order, and remand for further proceedings not inconsistent with this opinion.

---

**14.** Under some circumstances, judicial instructions which direct administrative actions relieve the United States of its obligation as trustee for Indians. *United States v. Mason,* 412 U.S. 391, 400, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973). It should be clear that nothing in this opinion constitutes such an instruction; we have not prejudged any of the requests for monetary or injunctive relief against the United States as trustee, note 3, *supra,* which may be made later in this suit.