BUSSE BROADCASTING CORPORA-
TION and Pappas Telecasting of
the Midlands, Appellants,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Citadel Communications Company
Ltd., Intervenor.

Nos. 95–1365, 95–1366.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 26, 1996.

Decided July 12, 1996.

Vincent A. Pepper, Washington, DC, argued the cause for appellants. With him on the briefs were John G. Johnson, Jr. and Scott M. Badami.

Joel Marcus, Counsel, Federal Communications Commission, argued the cause for appellee. With him on the briefs were William E. Kennard, General Counsel, Christopher J. Wright, Deputy General Counsel, Daniel M. Armstrong, Associate General Counsel, Anne K. Bingaman, Assistant Attorney General, United States Department of Justice, Robert B. Nicholson, and Marion L. Jetton, Attorneys.

Maureen E. Mahoney, Washington, DC, argued the cause for intervenor. With her on the brief were Kevin C. Boyle and Eric L. Bernthal.

Before: SILBERMAN, RANDOLPH and TATEL, Circuit Judges.

TATEL, Circuit Judge:

Citadel Communications Company, Ltd. applied to the Federal Communications Commission for permission to move KCAN–TV, a television station broadcasting ABC programs on VHF Channel 8, from Albion to Lincoln, Nebraska. Citadel also applied to operate a newly established UHF television station in Albion, Channel 24. Concerned that moving KCAN would deprive residents in the Albion area of network programming, the FCC approved the application subject to Citadel initiating ABC programming on Channel 24.

Two competitors providing television service in the Lincoln area objected to Citadel's proposal before the Commission and now press three arguments on appeal. Claiming that the FCC had never previously required a television station to broadcast a particular network's programs and that the agency failed to explain its departure from precedent, they first argue that the FCC acted arbitrarily and capriciously in requiring Citadel to commence ABC service on Channel 24 in Albion. Because the competitors failed to provide the agency a fair opportunity to address this argument, we decline to reach it. The competitors also argue that the FCC impermissibly waived its "duopoly rule," which would normally prohibit Citadel from owning both Channel 24 in Albion and another television station, Channel 9 in Sioux City, Iowa. Rejecting that argument, we conclude that the agency did not abuse its discretion in waiving the duopoly rule through adjudication and that, to the extent the agency departed from precedent, it offered a reasonable explanation for doing so. Finding equally without merit the competitors' third argument—that the FCC failed to distinguish this case adequately from the so-called "*Anniston*" case—we affirm the FCC's order.

I.

Since 1986, Citadel has owned KCAN–TV, a television station broadcasting on VHF Channel 8 from Albion, Nebraska. Citadel

operates KCAN as a "satellite" of another television station that it owns, KCAU–TV, an ABC affiliate broadcasting on Channel 9 from Sioux City, Iowa. As a satellite station, KCAN generally does not originate its own programming, but retransmits ABC programs appearing on KCAU. Through this arrangement, KCAN has provided ABC programming to the Albion area.

In 1991, Citadel applied to the FCC to move KCAN from Albion, a community of about 2,000 people, to Lincoln, the state capital with a population of nearly 200,000. According to Citadel, Albion was too small to support a VHF station, and Lincoln, with only one local commercial VHF station, was under-served. As part of its application, Citadel proposed "reallotting" Channel 8 from Albion to Lincoln as well as modifying KCAN's license to indicate that Lincoln would be its new community of license. To assure continued local television service to Albion, Citadel also proposed that the FCC allot a new UHF channel to Albion, Channel 18. Citadel promised that, if the FCC approved its requests, it would apply for a permit to construct and operate Channel 8 in Lincoln. It also pledged to apply to construct and operate the new Channel 18 in Albion as a satellite of Channel 9 in Sioux City, thereby assuring continued ABC programming in the Albion area.

Citadel's application precipitated a series of FCC Orders, additional Citadel filings, and several filings by intervening opponents. Because these proceedings are important to understanding the issues before us, we describe them in some detail. They began in April 1993 when the FCC's Mass Media Bureau approved the proposed reallotments of channels 8 and 18, but refused to approve either the modification permit to change KCAN's community of license or the construction permit to allow Citadel to build and operate KCAN in Lincoln unless Citadel satisfied what the parties refer to as the "ABC condition." To "ensure that virtually all of the current viewers of Albion Channel 8 will experience no significant loss of network television service," the Bureau required Citadel to "initiate[ ]" ABC network service on Channel 18 in Albion before it could move

KCAN from Albion to Lincoln. *Amendment of Section 73.606(b), Table of Allotments, Television Broadcast Stations (Albion, Lincoln, and Columbus, Nebraska)*, 8 F.C.C.R. 2876, 2878–79 (MMB 1991) (report and order).

In response to the Bureau's April 1993 order, Citadel applied for the necessary permits. With regard to moving Channel 8, it sought a permit to change KCAN's community of license from Albion to Lincoln and a permit to construct and operate Channel 8 in Lincoln. Citadel also applied for a permit to construct and operate the new Channel 18 in Albion. While these applications were pending, two developments affected Citadel's application to construct Channel 18. ABC informed Citadel that it would make Channel 8 an ABC affiliate once the station moved to Lincoln, prompting Citadel to amend its application to indicate that it would operate Channel 18 in Albion as a satellite of Channel 8 in Lincoln, rather than as a satellite of Channel 9 in Sioux City. More significant, another company applied to operate Channel 18 in Albion. To avoid a comparative hearing on the competing applications to construct Channel 18, the Mass Media Bureau proposed and after public comment approved allotting a new UHF channel, Channel 24, to Albion. *Amendment of Section 73.606(b), Table of Allotments, Television Broadcast Stations (Albion, Nebraska)*, 10 F.C.C.R. 3183 (MMB 1995). Citadel then changed its application for a construction permit for Channel 18, indicating that it would construct Channel 24 instead.

As a result of these developments, Citadel's final proposal was to move KCAN from Channel 8 in Albion to Channel 8 in Lincoln, which involved reallotting Channel 8 from Albion to Lincoln, modifying KCAN's license to change its community of license from Albion to Lincoln, and providing Citadel with a permit to construct and operate Channel 8 in Lincoln. Citadel also proposed operating UHF Channel 24 in Albion as a satellite of its proposed Lincoln station, which involved allotting Channel 24 to Albion and granting Citadel a permit to construct and operate Channel 24.

Two television companies serving the Lincoln area—Busse Broadcasting Corporation, which operates the local CBS affiliate in Lincoln, and Pappas Telecasting of the Midlands, which operates the Fox network affiliate in Omaha, Nebraska—opposed Citadel at virtually every stage of these proceedings. Four of their challenges are relevant here. First, when the Bureau approved reallocating channels 8 and 18 in April 1993, they petitioned the agency for reconsideration of that decision. Second, when the Mass Media Bureau proposed to allot Channel 24 to Albion, Busse objected; after the Bureau approved the allocation, Busse petitioned the Commission for review. Third, the competitors objected to all of Citadel's permit applications. And, finally, Busse petitioned the Commission to stay consideration of Citadel's permit applications until the Commission addressed the reallocations that the Bureau approved in April 1993.

In June 1995, the Commission issued three related orders generally approving Citadel's proposal. Rejecting the competitors' petition for reconsideration of the Bureau's April 1993 order, the Commission approved the reallocation of Channel 8 from Albion to Lincoln. *Amendment of Section 73.606(b), Table of Allotments, Television Broadcast Stations (Albion, Lincoln, and Columbus, Nebraska),* 10 F.C.C.R. 11,931 (1995). Rejecting Busse's petition for review, the Commission approved the allocation of Channel 24 to Albion. *Amendment of Section 73.606(b), Table of Allotments, Television Broadcast Stations (Albion, Nebraska),* 10 F.C.C.R. 11,927 (1995). Finally, without addressing Busse's petition for a stay, the Commission approved Citadel's permit applications to change KCAN's community of license to Lincoln and to construct and operate the stations in Lincoln and Albion. *Citadel Communications Co.,* 10 F.C.C.R. 11,910 (1995). The Commission continued the ABC condition, approving the move from Albion to Lincoln "subject to the condition that . . . [Channel 24 in Albion] is operational and has commenced ABC Network service." *Citadel Communications Co.,* 10 F.C.C.R. at 11,924.

The competitors filed a notice of appeal under 47 U.S.C. § 402(b)(6) and, alternatively, a petition for review under 47 U.S.C. § 402(a). Because our analysis is the same under either, we need not decide which provision governs.

## II.

■ During oral argument, the competitors abandoned their lead argument that imposing the ABC condition violated section 326 of the Communications Act, which prohibits "censorship" of television broadcasting. *See* 47 U.S.C. § 326 (1994). Accepting the Commission's interpretation of the ABC condition—that it does not impose an ongoing obligation on Citadel but only requires that the company "initiate" ABC programming on Channel 24—the competitors conceded that such a fleeting condition does not violate section 326. Claiming that the Commission had never previously imposed a programming requirement like the ABC condition on a television station, the competitors nevertheless argue that the Commission's failure to explain its departure from precedent in imposing the condition was arbitrary and capricious. Because the FCC did not have a fair opportunity to address this argument, however, we do not reach it.

■ Section 405 of the Communications Act "codif[ies] the exhaustion of administrative remedies doctrine," which requires those challenging the Commission's actions " 'to give the FCC a fair opportunity to pass on a legal or factual argument.' " *American Tel. & Tel. Co. v. FCC,* 974 F.2d 1351, 1354 (D.C.Cir.1992) (quoting *City of Brookings Mun. Tel. Co. v. FCC,* 822 F.2d 1153, 1163 (D.C.Cir.1987)). As the Commission concedes, Busse did suggest to the agency that the ABC condition was an unwarranted departure from precedent. In its petition for a stay in November 1994, Busse observed that

> [t]he Commission has yet to address the relevant threshold issue in the instant proceeding; that is, whether it can condition a community of license switch . . . on a specific program format. . . . The [ABC] condition is far beyond anything the staff has ever done in the context of a rule making.

JA at 303–04. A few months later, in February 1995, Busse repeated this complaint. When the Mass Media Bureau proposed allotting Channel 24 to Albion, Busse stated in its comments to the Bureau that "the Commission does not regulate program formats or changes thereof. Nearly 20 years ago, the Commission determined that such changes were best left to the marketplace." JA at 333.

■ Although Busse thus raised the departure-from-precedent issue, the Commission nevertheless argues that it did not have a "fair" opportunity to address this argument because Busse failed to comply with regulations requiring that petitions for reconsideration and petitions for review state "with particularity" the reasons why the Commission should overturn staff decisions. *See* 47 C.F.R. § 1.106(d) (1995) (petition for reconsideration); § 1.115(b) (petition for review). We are unpersuaded. Although "exhaustion principles normally require compliance with the agency's procedural rules," *see Northwestern Indiana Tel. Co. v. FCC*, 872 F.2d 465, 470–71 (D.C.Cir.1989), *cert. denied*, 493 U.S. 1035, 110 S.Ct. 757, 107 L.Ed.2d 773 (1990), and although Busse admittedly did not present its argument in a petition for either reconsideration or review, the cited regulations do not explicitly address, let alone preclude parties from, raising issues in petitions for stay, where Busse indisputably presented the argument at issue here. Indeed, in determining whether parties have adequately raised issues before the FCC, we have previously considered arguments made in connection with petitions for stay. *See Northwestern Indiana Tel. Co. v. FCC*, 824 F.2d 1205, 1210 n. 8 (D.C.Cir.1987).

In the end, however, we agree with the Commission that, because Busse seemed to abandon its argument against the ABC condition by taking inconsistent positions, the agency did not have a fair opportunity to address this argument. Although the November 1994 petition for stay and the comments before the Mass Media Bureau challenged the validity of the ABC condition, Busse's other filings appeared to argue in favor of the condition. Specifically, in the summer of 1993, Busse petitioned the agency

to reconsider the Bureau's initial order imposing the ABC condition, arguing that "the Commission ... must require that Citadel replicate as nearly as possible the deleted Albion–8 service." JA at 83. Busse doubted that

> [e]ither Citadel [ ]or any other applicant for [the new Albion station] can be successful in obtaining an ABC network affiliation such as exists for the present Albion–8.... For this reason, the Commission *must consider* the loss of ABC network service on [the new Albion station] that would result from the grant of Citadel's petition and the accompanying application for a construction permit.

JA at 129 (emphasis added). Again, in April 1995, after the Bureau allotted Channel 24 to Albion without explicitly reiterating the ABC condition, Busse petitioned for review, complaining that the Bureau

> would permit Citadel to amend its ... application for a construction permit on Channel 18 at Albion ... to specify Channel 24 ... [and] imposes no requirement of ABC affiliation for Citadel on the new channel. The [Bureau] could not have meant to drop the ABC affiliation requirement that it imposed on Channel 18 when it granted the allocation....

JA at 360. Thus, at the time of the Commission's decision, whether Busse opposed the ABC condition was not at all clear. While the petition for stay questioned the validity of the ABC condition, the other two petitions before the Commission—the petition for reconsideration and the petition for review—were supportive. Indeed, the most recent of the three petitions, the petition for review submitted in April 1995, implicitly encouraged the Commission to enforce the ABC condition on Channel 24. In these circumstances, where Busse did not present its conflicting positions as alternative arguments but appeared to abandon its opposition to the ABC condition, we agree with the FCC that it did not have a "fair" opportunity to address the argument that the ABC condition was an invalid departure from precedent. *Cf. City of Brookings Mun. Tel. Co.*, 822 F.2d

at 1164 (declining to create an exception to requirement that petitioners exhaust their administrative remedies when "petitioners themselves [were] at least partly responsible for the agency's failure to address" petitioners' objection).

### III.

■ The competitors also claim that the Commission improperly waived its "duopoly rule," by allowing Citadel to own both Channel 24 in Albion and Channel 9 in Sioux City. The duopoly rule was adopted in 1970 to "foster[ ] maximum [economic] competition in broadcasting" and "to promot[e] diversification of programming sources and viewpoints," *Amendment of Sections 73.35, 73.240 & 73.636 of the Comm'n Rules Relating to Multiple Ownership of Standard, FM & Television Broadcast Stations,* 22 F.C.C.2d 306, 307 (1970), *recon. granted in part,* 28 F.C.C.2d 662 (1971), the duopoly rule generally prohibits a single entity from owning two television stations if their Grade B contours overlap. *See* 47 C.F.R. § 73.3555 (1995). Grade B contours mark the estimated outer boundaries of satisfactory reception from a television station, assuming average terrain and no interference from other stations. 47 C.F.R. § 73.684 (1994); *WLOS TV, Inc. v. FCC,* 932 F.2d 993, 996 (D.C.Cir.1991). The Commission has created an exception to this rule where one station is a satellite of the other. *See* 47 C.F.R. § 73.3555 n.5; *WLOS TV, Inc.,* 932 F.2d at 995. And even when two stations are not in a satellite relationship with each other, the agency may waive the duopoly rule if applying it would be " 'inappropriate.' " *Office of Communication of United Church of Christ v. FCC,* 911 F.2d 803, 812 (D.C.Cir.1990) (quoting *Amendment of Sections 73.35, 73.240 & 73.636 of the Comm'n Rules Multiple Ownership of Standard, FM & Television Broadcast Stations,* 45 F.C.C. 1476, 1479 n. 12 (1964)); *see also* 47 U.S.C. § 73.3566 (1995) (permitting waiver). Because the Grade B contours of channels 24 and 9 overlap, and because the stations do not have a satellite relationship with each other, the duopoly rule would normally prevent Citadel from owning both stations. Concluding that a waiver would serve the public interest, however, the Commission

waived the rule. *See Citadel Communications Co.,* 10 F.C.C.R. at 11,918–22.

■ Before turning to the merits of the competitors' challenges, we must address the Commission's argument that the competitors lack prudential standing to challenge its waiver of the duopoly rule. According to the Commission, parties challenging its orders pursuant to section 402 of the Communications Act must assert an injury within the "zone of interests" protected by an underlying statute or regulation. The duopoly rule, the Commission argues, is designed to ensure that viewers in the overlap area have access to a diversity of viewpoints and that stations serving the overlap area are protected from undue concentrations of economic power. Because neither Pappas nor Busse is a viewer or serves the overlap area, the Commission argues that their economic interests as potential competitors of Citadel fall outside the zone of interests protected by the duopoly rule.

■ Although we are obliged to address jurisdictional questions prior to reaching the merits, we have recognized a narrow exception: " '[W]hen the merits of a case are clearly against the party seeking to invoke the court's jurisdiction, the jurisdictional question is especially difficult and far-reaching, and the inadequacies in the ... briefing make the case a poor vehicle for deciding the jurisdictional question, we may rule on the merits without reaching' the jurisdictional contention." *Cross–Sound Ferry Servs., Inc. v. ICC,* 934 F.2d 327, 333 (D.C.Cir.1991) (quoting *Adams v. Vance,* 570 F.2d 950, 954 n. 7 (D.C.Cir.1978). Whether this test applies to prudential standing issues is not entirely clear, *compare Cross–Sound Ferry,* 934 F.2d at 333 (setting forth conditions in which court may not reach jurisdictional issues, without distinguishing between constitutional and prudential questions) *with National Maritime Union v. Commander, Military Sealift Command,* 824 F.2d 1228, 1238 (D.C.Cir.1987) (deciding not to reach prudential standing question, without engaging in the three-part analysis), but we need not resolve that issue because this case clearly meets all three criteria.

To begin with, the jurisdictional issue is "especially difficult and far-reaching." Resolving it would require us to decide whether competing broadcasters challenging an FCC order under section 402 of the Communications Act must not only invoke a public interest, but also allege a harm that falls within the "zone of interests" protected by the underlying statute or regulation they accuse the agency of violating. This would in turn require us to reconcile, if possible, several competing precedents. On the one hand, both the Supreme Court and we have arguably treated section 402(b) as authorizing competing broadcasters to challenge FCC orders as " 'private attorneys general,' " *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153 n. 1, 90 S.Ct. 827, 829 n. 1, 25 L.Ed.2d 184 (1970) (discussing *FCC v. Sanders Bros. Radio Station,* 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940) (interpreting section 402 of the Communications Act)); *Spann v. Colonial Village, Inc.,* 899 F.2d 24, 30–31 (D.C.Cir.) (citing *Sanders* in a discussion of statutes creating private attorneys general), *cert. denied,* 498 U.S. 980, 111 S.Ct. 508, 509, 112 L.Ed.2d 521 (1990), with authority "to raise ... any relevant question of law" regarding a Commission's order, *Sanders,* 309 U.S. at 477, 60 S.Ct. at 698, and to "assert the public interest even when their own interests do not precisely coincide," *Spann,* 899 F.2d at 31. Indeed, when the Supreme Court coined the zone of interests test for parties suing under the APA, it implicitly distinguished the APA from section 402. *See Association of Data Processing Serv. Orgs.,* 397 U.S. at 153 n. 1, 154, 90 S.Ct. at 829 n. 1, 830 (distinguishing *Sanders*). On the other hand, it is clear that challengers relying on statutes other than the APA may need to satisfy something akin to the zone of interests requirement. *See Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 400 n. 16, 107 S.Ct. 750, 757 n. 16, 93 L.Ed.2d 757 (1987). And, although not explicitly invoking the zone of interests test, this court has dismissed on prudential standing grounds a challenge brought by viewers under section 402(b) of the Act. *See Coalition for the Preservation of Hispanic Broadcasting v. FCC,* 931 F.2d 73, 79–80 (D.C.Cir.) (en banc),

*cert. denied,* 502 U.S. 907, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991).

Aside from the difficulty of reconciling these two lines of cases, the parties have also not extensively briefed the zone of interests issue. The Commission raised its zone of interests challenge to the competitors' duopoly rule argument in a footnote. In response, the competitors argued only that parties bringing challenges under section 402(b) do not need to satisfy the zone of interests test. They did not address whether the Commission accurately described the interests protected by the duopoly rule and thus whether they could satisfy a zone of interests requirement if it does apply.

 Compared to the jurisdictional issue, the merits are easy. Indeed, the competitors' challenges to the agency's waiver of the duopoly rule are plainly without merit. The competitors first claim that the Commission should have handled Citadel's request through rulemaking rather than adjudication. They concede, as they must, that "the choice between rulemaking and adjudication lies in the first instance with the [agency]'s discretion," *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974). They nevertheless argue that the agency abused its discretion because two Commissioners have advocated dealing with the duopoly issue through rulemaking, *see, e.g., Citadel Communications Co.,* 10 F.C.C.R. at 11,925 (Barrett, concurring); *NewCity Communications, Inc.,* 10 F.C.C.R. 4985, 4992 (1995) (Quello, concurring), and because the Commission has proposed, but not yet approved, a new regulation governing television duopolies, *see Review of the Commission's Regulations Governing Television Broadcasting,* 7 F.C.C.R. 4111 (1992) (notice of proposed rulemaking); *Review of the Commission's Regulations Governing Television Broadcasting,* 10 F.C.C.R. 3524 (1995) (further notice of proposed rulemaking). To us, these efforts suggest not an abuse of discretion, but only an honest disagreement over the proper way to handle the duopoly issue. Given the fact-intensive nature of the Commission's role in these proceedings, it is surely within the agency's authority to proceed on a case-by-case basis rather than by

rulemaking. *Cf. Bell Aerospace Co.*, 416 U.S. at 294, 94 S.Ct. at 1771–72 (noting that "adjudication [was] especially appropriate" where there were a large number of potential cases and the facts "var[ied] widely" from situation to situation).

Elaborating on their abuse of discretion argument, the competitors contend that the Commission has so consistently waived the duopoly rule through adjudication that it has effectively repealed its rule, and that, because the agency can only repeal a regulation through the APA's rulemaking process, this amounts to an abuse of discretion. As evidence that the Commission has repealed the duopoly rule, the competitors claim that the Commission has always waived the rule where, as here, an applicant sought to own two television stations not in a satellite relationship with each other.

Even assuming that repeatedly waiving a rule through adjudication effectively repeals it and that doing so can amount to an abuse of discretion—propositions for which the competitors cite no precedent—we think the agency has not even come close to repealing the duopoly rule. Waiving the rule in a certain class of cases does not mean that the rule is dead; it may simply reflect the strength of the applications before the agency. Indeed, the duopoly rule is very much alive. The Commission has refused to grant exceptions to its television duopoly rule when applicants sought to own two television stations in a satellite relationship with each other. *See, e.g, Meredith Corp.*, 5 F.C.C.R. 7015 (1990). It has also denied waivers of the FM radio duopoly rule, which is similar to the television rule. *See, e.g., Patteson Brothers, Inc.*, 8 F.C.C.R. 7595 (1993). Moreover, we find nothing *pro forma* in the agency's consideration of Citadel's request to waive the duopoly rule here. The Commission carefully considered Citadel's request, weighing several factors to determine if waiving the duopoly rule would be in the public interest. *See Citadel Communications Co.*, 10 F.C.C.R. at 11,920–22. By any stretch of the imagination, the FCC has thus not repealed the duopoly rule for television.

▮ As an alternative to their abuse of discretion argument, the competitors claim that the Commission arbitrarily abandoned its own precedent in granting the duopoly waiver here. Settled Commission precedent establishes that, in considering a request to waive the duopoly rule, the agency's overriding goal is to determine whether a waiver is in the public interest, including whether it is consistent with the duopoly rule's goals of promoting economic competition and diversification of viewpoints. *See Citadel Communications Co.*, 10 F.C.C.R. at 11,918. In situations where more than a *de minimis* overlap would exist between two non-satellite stations, the Commission traditionally considers the extent of the overlap (including the size of the population and land within the overlap area), the independence of the two stations' operations, "the number of media voices in the overlap area," the effect of the duopoly on competing stations, and the effect on television service in under-served areas. *H & C Communications, Inc.*, 9 F.C.C.R. 144, 145–46 (1993). The competitors do not suggest that the Commission failed to consider any of these factors. Rather, they contend that the agency violated precedent in three rather narrow respects.

They first claim that the Commission never previously approved a waiver where such a large percentage of the population served by one station would also be served by another station owned by the same company. The result in this case, however, is not dramatically out of line with prior cases. Here, 32,000 people (representing 33% of the population within Channel 24's estimated viewing area and 5% of the population in Channel 9's estimated viewing area) live within the overlap area potentially receiving signals from both stations. As the Commission noted, it previously approved a duopoly waiver with a nearly comparable population overlap, in which 24% of the people in one viewing area and 12% of the people in another area would receive signals from both stations. *Citadel Communications Co.*, 10 F.C.C.R. at 11,919 (citing *Capital Cities Communications*, 59 R.R.2d 451, 461 (1985)). The Commission's reasoning is also completely consistent with earlier cases. As in the past, the Commission here did not regard the percentage of population overlap as dispositive, instead con-

sidering it as one factor in determining if the waiver is in the public interest. Although acknowledging that Citadel's proposal involved a relatively large population overlap, *id.* at 11,920, the Commission determined this factor was outweighed by its findings—undisputed here—that Citadel would be "unlikely" to exercise a dominant influence on public opinion in the overlap area and that Citadel's common ownership would "not result in an undue concentration of economic power," *id.* at 11,921.

The competitors' second complaint is that in considering that most of the people in the overlap area lived in Norfolk, Nebraska, the Commission inexplicably departed from precedent. According to the competitors, the Commission had never before considered whether the population in the overlap area was concentrated in a single community. Because the Commission's finding—that "the existence of a population center within the overlap area, in the typical duopoly case, argues *against* ... a duopoly waiver," *id.* at 11,920 (emphasis added)—weighs in the competitors' favor, we do not understand why they even raise it. In any event, the competitors point to no precedent foreclosing the Commission from considering this factor, and it seems perfectly reasonable for the Commission to consider whether a single company will own two television stations serving a major population center in the region.

Finally, the competitors note that the Commission considered that Norfolk was at the edge of the Sioux City station's Grade B contour, and thus Norfolk residents might receive a quality signal only from Albion, not from Sioux City. According to the competitors, the Commission had previously considered only whether Grade B contours overlapped, not the quality of a signal within the overlap area. Again, the competitors point to no precedent prohibiting the Commission from considering signal strength. More important, we think the Commission adequately justified its consideration of the signal's quality. It explained that this case involved a "unique situation," in which the agency wanted to ensure that people in the Albion viewing area (including Norfolk) could continue to receive network programming. *Id.* at 11,-

920–21. The Commission was therefore concerned not just with the estimated range of the television signals reflected in the Grade B contours, but also with viewers' actual ability to receive network programming.

█ We thus find nothing arbitrary about the Commission's decision to permit Citadel to own both Channel 24 in Albion and Channel 9 in Sioux City. Its decision to grant the waiver departed little, if at all, from precedent. To the extent it may have departed, the Commission offered an entirely reasonable and adequate explanation. Agencies may modify and even reverse precedent through adjudication, *see, e.g., Columbia Broadcasting Sys., Inc. v. FCC*, 454 F.2d 1018, 1026 (D.C.Cir.1971), so long as they provide an "adequate explanation" for doing so, *Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C.Cir.1994).

### IV.

The competitors' last challenge—that the Commission did not adequately explain its failure to follow an earlier decision in the *Anniston* case, *Amendment of Section 73.202(b), Table of Allotments, FM Broadcast Stations (Eatonton and Sandy Springs, Georgia, and Anniston and Lineville, Alabama)*, 6 F.C.C.R. 6580 (MMB 1991) (application for review pending)—is equally unpersuasive. In *Anniston,* the applicant proposed moving an FM radio station from the community of Anniston, Alabama to the rapidly growing Atlanta suburb of Sandy Springs, Georgia. *Id.* at 6580. The Mass Media Bureau denied the application, considering, among other factors, the loss of radio service in the Anniston area. *Id.* at 6586.

Even assuming the Commission had an obligation to treat the staff's decision in *Anniston* as precedent, we believe that the Commission did a completely adequate job of distinguishing the two cases. The Commission pointed out that the *Anniston* decision involved moving a radio station, not a television station. *Citadel Communications Co.*, 10 F.C.C.R. at 11,923 n. 16. It explained that, even if relevant, the *Anniston* case involved a far larger disruption of existing service: Moving the radio station in that case

would have deprived over 400,000 people of a radio station, while the FCC projected that moving KCAN from Albion (and replacing it with Channel 24) would deprive approximately 50,000 people of one television channel, although 48,000 of them would continue to receive service on at least four other channels. *See Amendment of Section 73.606(b), Table of Allotments, TV Broadcast Stations (Albion, Lincoln, and Columbus, Nebraska),* 10 F.C.C.R. at 11,937–38 & n. 11; *Citadel Communications Co.,* 10 F.C.C.R. at 11,923 n. 16. The Commission also explained that, because Sandy Springs was already served by a "plethora" of stations while Lincoln had just one local commercial television station and one local noncommercial station, providing a new radio station to Sandy Springs offered a smaller marginal benefit to the community than providing a new television station to Lincoln. *Amendment of Section 73.606(b), Table of Allotments, TV Broadcast Stations (Albion, Lincoln, and Columbus, Nebraska),* 10 F.C.C.R. at 11,937 & n. 11.

We dismiss Busse's and Pappas' appeals, deny their petitions for review, and affirm the FCC's order.

*So ordered.*