Sheldon BARR, Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF JUSTICE, Philip T. White, R. Timothy Slattery, Robert Abram, Orestes J. Mihaly, Mark A. Tepper and Rebecca Mullane, Defendants-Appellees.

No. 815, Docket 86–6245.

United States Court of Appeals, Second Circuit.

Argued Feb. 27, 1987.

Decided May 11, 1987.

Sheldon Barr, pro se.

Howard L. Jacobs, New York City of counsel, for plaintiff-appellant.

David M. Nocenti, Asst. U.S. Atty., E.D. N.Y. (Andrew J. Maloney, U.S. Atty., Robert L. Begleiter, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for defendants-appellees U.S. Dept. of Justice et al.

August L. Fietkau, Asst. Atty. Gen., State of N.Y. (Robert Abrams, Atty. Gen., Lawrence S. Kahn, Deputy Sol. Gen., Howard L. Zwickel, Chief, Litigation Bureau, Richard G. Liskow, Asst. Atty. Gen., New York City, of counsel), for defendants-appellees Abrams et al.

Before KAUFMAN and CARDAMONE, Circuit Judges, and BONSAL, District Judge.*

IRVING R. KAUFMAN, Circuit Judge:

As developments in modern technology have made it increasingly easy for would-be wrongdoers to carry out their plans on an international scale, the countries of the world have sought stronger cooperation in combatting their schemes. In the case before us, an American citizen subjected to the procedures of one such mutual assistance arrangement asks us to apply the fundamental principle that, no matter how laudable its purposes, the actions of our government are always subject to the limitations of the Constitution. We do so unhesitatingly, while at the same time finding that the complaining party before us has failed to make a substantial showing that his rights were violated.

*FACTS*

Appellant Sheldon Barr, an attorney, has for several years been the subject of a fraud investigation by the Attorney General of the State of New York. *See generally Barr v. Abrams*, 810 F.2d 358 (2d Cir. 1987).

* Of the United States District Court for the South-    ern District of New York, sitting by designation.

On April 29, 1986, Barr was indicted by a New York grand jury for conspiracy, fraud and grand larceny. The grand jury charged in substance that Barr and others had engaged in a scheme to defraud the public by misrepresenting the value of energy conservation devices that they leased to investors. The state claims that this scheme may have defrauded as many as 695 persons out of a total of $13 million.

Believing that Barr's portion of the fruits of the alleged fraud had been deposited in Swiss bank accounts, the New York Attorney General's office requested the United States Department of Justice to transmit to Switzerland a request pursuant to this country's Treaty with the Swiss Confederation on Mutual Assistance in Criminal Matters, 27 U.S.T. 2019, T.I.A.S. No. 8302 (May 25, 1973), seeking a freeze on all bank accounts held by Barr or companies under his control. The Department of Justice complied, transmitting the request on April 30, 1986.

The Swiss government acceded to the request, immobilizing funds in excess of $2 million. While the precise date on which the Swiss authorities acted is unclear, and Barr claims that he first learned of the freeze order when notified of it by one of his Swiss banks, it is undisputed that he retained Swiss counsel and filed objections to the freeze order by letters dated June 5, June 30, and July 22, 1986. In response, the Swiss Federal Police Administration Bureau issued an order dated July 24, 1986 explaining why his objections were insufficient under the Treaty. Barr appealed this order to the Swiss Federal Court. On January 21, 1987, that court vacated the order of the Police Administration Bureau and remanded the proceeding. After remand, the bureau on March 16, 1987 issued another order rejecting Barr's objections to the freeze. The order noted that Barr again had a right of appeal to the Swiss Federal Court.

Meanwhile, on July 22, 1986, Barr commenced the present action in the United States District Court for the Eastern District of New York against the state and federal officials involved in making the request to Switzerland. Alleging that the freeze of his assets was unauthorized by the Treaty and in violation of his constitutional rights, Barr sought an injunction directing the United States to withdraw its request, as well as monetary relief.

On October 15, 1986, Judge Eugene H. Nickerson denied Barr's motion for a preliminary injunction. 645 F.Supp. 235. Barr appeals.

### DISCUSSION

#### A. *The Applicable Standard*

Judge Nickerson held that, because the injunction Barr sought would interfere with the executive branch's conduct of foreign affairs, the application must be considered under particularly stringent standards, *citing Sampson v. Murray*, 415 U.S. 61, 83–84, 94 S.Ct. 937, 949–50, 39 L.Ed.2d 166 (1974); *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C.Cir.1978). Since we conclude that Barr failed to make even the ordinary showing required for the grant of a preliminary injunction, we do not reach the issue whether he could properly have been held to more demanding requirements.

#### B. *Irreparable Injury*

In the district court, Barr alleged that he was threatened with irreparable injury because the freeze of his funds deprived him of the ability to retain counsel of his choice to defend against New York's criminal charges. Judge Nickerson held that, since Barr had made no showing that he lacked the means to retain less expensive counsel, and because the state would in any event appoint counsel if he were indigent, this allegation failed to make out a claim of irreparable injury.

The point is a sensitive and potentially far-reaching one, and in light of our determination that Barr has failed to demonstrate a likelihood of success on the merits, we think it best to pretermit this issue—especially in light of the stipulation of the parties in this court that Barr does at present have the financial ability to retain counsel of his choice in the state criminal

proceedings. *Cf. Recon/Optical, Inc. v. Government of Israel,* 816 F.2d 854 (2d Cir.1987) (Denying preliminary injunction due to inadequate showing on merits and not reaching issue of irreparable injury).[1]

## C. *The Merits*

The grant or denial of a preliminary injunction generally rests within the sound discretion of the district court, and will be overturned on appeal only if the appellant demonstrates an abuse of discretion. *Doran v. Salem Inn, Inc,* 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975); *Dixon v. Heckler,* 785 F.2d 1102, 1106 (2d Cir.1986); *Taylor Wine Co., Inc. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731, 732 n. 1 (2d Cir.1978). Particularly since the injunction sought here was mandatory in character, Barr cannot make that demonstration in this case. *See Doe v. New York University,* 666 F.2d 761, 773 (2d Cir.1981) ("[R]elief changing the status quo is not favored unless the facts and law clearly support the moving party."). The district court did not abuse its discretion in denying the preliminary injunction inasmuch as Barr's showing on the merits was insufficient to raise serious questions as to whether he would prevail.

██ To be sure, it is unquestionably the law that a treaty may authorize only such governmental action as is in conformity with the Constitution. *Reid v. Covert,* 354 U.S. 1, 16–18, 77 S.Ct. 1222, 1230, 1 L.Ed.2d 1148 (1957); *U.S. v. Wong Kim Ark,* 169 U.S. 649, 701–03, 18 S.Ct. 456, 476–77, 42 L.Ed. 890 (1898); *Geofroy v. Riggs,* 133 U.S. 258, 267, 10 S.Ct. 295, 297, 33 L.Ed. 642 (1890).

And we proceed on the premise that the agency principles relevant in the context of state action generally, *see Norwood v. Harrison,* 413 U.S. 455, 467, 93 S.Ct. 2804, 2811, 37 L.Ed.2d 723 (1973); *Reitman v. Mulkey,* 387 U.S. 369, 375–81, 87 S.Ct. 1627, 1631–34, 18 L.Ed.2d 830 (1967); *Evans v. Newton,* 382 U.S. 296, 299–302, 86 S.Ct. 486, 488–90, 15 L.Ed.2d 373 (1966); *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961); *Smith v. Allwright,* 321 U.S. 649, 661–64, 64 S.Ct. 757, 763–65, 88 L.Ed. 987 (1944), apply in this case and require attribution to the American government of those actions that the Swiss government carried out at its request. *See U.S. v. Jordan,* 24 C.M.A. 159 (1976). To determine whether our government is sufficiently involved in the actions of a foreign government so that a litigant in our courts who has been harmed by the actions of the foreign government may successfully claim that he has been the victim of a constitutional violation, we have in the past looked to whether the actions of the foreign government were foreseeable and whether the refusal of the American courts to sanction them would deter inappropriate conduct by the American government in the future.[2] *See, e.g., U.S. v. Lira,* 515 F.2d 68, 71 (2d Cir.), *cert. denied,* 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975). *See also U.S. ex rel Lujan v. Gengler,* 510 F.2d 62 (2d Cir.), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975). In the case before us, neither element presents any difficulties. The actions taken by the Swiss authorities were the precise ones that American officials requested, and if we were to hold such requests to be im-

---

1. Barr asserts, however, that he needs the frozen assets to pay other expenses of his defense, such as the fees for transcripts and experts. As with the claimed right to funds for the retention of counsel, we intimate no view on whether these allegations suffice to state a claim of threatened irreparable injury.

2. Barr does not claim, nor do we find, that the actions of the Swiss authorities were intrinsically violative of fundamental fairness. Accordingly, there is no need to apply in this case the recognized principle that, regardless of the degree of American government involvement in the conduct of a foreign sovereign, the federal courts will not allow themselves to be placed in the position of putting their imprimatur on unconscionable conduct. *See U.S. ex rel. Bloomfield v. Gengler,* 507 F.2d 925, 928 (2d Cir.1974); *U.S. v. Toscanino,* 500 F.2d 267 (2d Cir.1974); *U.S. v. Nagelberg,* 434 U.S. 585, 587 n. 1 (2d Cir.1970), *cert. denied,* 401 U.S. 939, 91 S.Ct. 935, 28 L.Ed.2d 219 (1971). *See generally U.S. v. Russell,* 411 U.S. 423, 432–33, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973); *Rochin v. California,* 342 U.S. 165, 173, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952).

proper we could effectively put a stop to them through the grant of an injunction.

But Barr has not shown that either country violated the Treaty or deprived him of constitutional rights.[3]

The Treaty provides in Article 4 a non-exclusive list of measures that the two countries may take to assist each other in criminal investigations. A freeze of the assets of a criminal defendant is not specifically mentioned in the list. However, Article (8)(1) of the Switzerland's legislation implementing the Treaty does authorize that measure. Thus, both the American government (as shown by its request in this case) and the Swiss government (as shown its implementing legislation) believe that such a freeze is one of the mutual assistance measures embraced by the Treaty. This understanding is entitled to deference, Vienna Convention on the Law of Treaties, Art. 31(3)(6) (1969). Nor has Barr given us any reason to believe that it is wrong.

 Assuming therefore that the Treaty authorized the freeze, we must decide if Barr has raised a serious question as to whether the imposition of that temporary restraint deprived him of his property without due process of law. We hold that he has not done so.

New York sought the assistance of the federal government in preserving the suspected fruits of a crime for ultimate return to the alleged victims only after a grand jury had found probable cause to believe that a crime had been committed and that Barr had committed it. Barr learned of the freeze order shortly after it was entered, and obtained expeditious judicial review both in Switzerland and in the district court. At the same time, New York was pursuing its criminal case in a timely fashion. Barr was able to raise in the state proceedings the claim that the New York Attorney General proceeded in a manner

unauthorized by state law. In the event of an acquittal in that action, Barr's funds would be released to him.

Under these circumstances, the likelihood that Barr would be able to show that the seizure violated his right to due process of law was sufficiently low to warrant the district court in denying a preliminary injunction. *See generally Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 676–80, 94 S.Ct. 2080, 2088–90, 40 L.Ed.2d 452 (1974), *approved, U.S. v. Eight Thousand Eight Hundred and Fifty Dollars,* 461 U.S. 555, 562 n. 12, 103 S.Ct. 2005, 2011 n. 12, 76 L.Ed.2d 143 (1983).

Affirmed.

---

**3.** Barr also suggests that the New York Attorney General's actions in this case exceeded his authority under New York law. While this allegation might be relevant to Barr's due process claim under certain circumstances, *see Sullivan v. Town of Salem,* 805 F.2d 81 (2d Cir.1986), we abstain from deciding it now in light of the pending state criminal proceedings in which this issue may be adjudicated. *See Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).